UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GARAGE DOOR SYSTEMS, LLC *d/b/a Overhead Door Company of Indianapolis*, )<br>)<br>*Plaintiff*, )<br>)<br>vs. )<br>)<br>BLUE GIANT EQUIPMENT CORPORATION, )<br>)<br>*Defendant*. ) | No. 1:23-cv-02223-JMS-KMB |

## ORDER

Plaintiff Garage Door Systems, LLC d/b/a Overhead Door Company of Indianapolis ("ODC") initiated this litigation against Defendant Blue Giant Equipment Corporation ("Blue Giant") related to ODC's purchase of mechanical dock levelers it later installed at one of its customer's distribution centers and which it claims failed, along with related products it purchased to remedy the failure. ODC sets forth claims against Blue Giant for breach of contract, breach of express warranty, breach of implied warranty, and fraudulent misrepresentation. Blue Giant claims that the agreements governing ODC's purchases contain a provision requiring the parties to arbitrate disputes in Ontario, Canada. It has filed a 12(b)(3) Motion to Dismiss for Improper Venue, which is now ripe for the Court's consideration. [Filing No. 16.]

### I.
### STANDARD OF REVIEW

"A Rule 12(b)(3) motion to dismiss for improper venue, rather than a motion to stay or to compel arbitration, is the proper procedure to use when [an] arbitration clause requires arbitration outside the confines of the district court's district." *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808 (7th Cir. 2011); *see also Cont'l Ins. Co. v. M/V ORSULA*, 354 F.3d 603, 606-

1

07 (7th Cir. 2003). Under Rule 12(b)(3), a party can move to dismiss an action for "improper venue." When deciding a motion to dismiss under Rule 12(b)(3), the Court must accept the allegations in the plaintiff's complaint as true unless those allegations are contradicted by evidence submitted by the defendant. *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016). "Rule 12(b)(3) is a somewhat unique context of dismissal in that a court may look beyond the mere allegations of a complaint, and need not view the allegations of the complaint as the exclusive basis for its decision." *Id.* "Where one party makes a bald claim of venue and the other party contradicts it, a district court may look beyond the pleadings to determine whether the chosen venue is appropriate." *Id.* at 809-10. "When a defendant challenges venue, the plaintiff bears the burden of establishing proper venue." *Allstate Life Ins. Co. v. Stanley W. Burns, Inc.*, 80 F. Supp. 3d 870, 875 (N.D. Ill. 2015) (citing *Int'l Travelers Cheque Co. v. BankAmerica Corp.*, 660 F.2d 215, 222 (7th Cir. 1981)).

## II.
### BACKGROUND

**A.    The Parties**

ODC engages in the business of residential and commercial garage door service, repair, and replacement. [Filing No. 11 at 4.] Blue Giant manufactures and distributes loading dock systems and material handling equipment, including dock levelers. [Filing No. 11 at 4.] ODC is an authorized distributor of Blue Giant's products. [Filing No. 11 at 4.]

**B.    General Contract Formation Between ODC and Blue Giant**

Beginning in April 2021, ODC purchased various products and services from Blue Giant and their contract formation process began with ODC reaching out to Blue Giant regarding a purchase and Blue Giant then sending a quote to ODC. [Filing No. 11 at 4; Filing No. 16-3 at 1.] The quote referenced Blue Giant's "Terms and Conditions" and identified its website where the

Terms and Conditions could be found. [Filing No. 16-3 at 1; *see, e.g.*, Filing No. 16-4 at 2.]

Specifically, the quote stated:

> TERMS:    FOR CURRENT TERMS AND CONDITIONS REFER TO
> www.Blue.Giant.com

[*See, e.g.*, Filing No. 16-4 at 2.] The Terms and Conditions on Blue Giant's website provided in relevant part:

> 25. DISPUTE RESOLUTION
>
> All disputes between the parties under this Agreement shall be resolved in accordance with the following procedures: (i) first, each party shall designate an individual with authority to settle the dispute, and such persons shall meet as soon as possible to attempt to resolve the dispute in good faith; (ii) second, if these individuals cannot resolve the dispute within ten (10) business days of their first settlement meeting, if the parties so agree, they may submit the dispute to mediation with such mediation to be commenced and administered under and conducted by a single mediator under the Commercial Arbitration Act…(the "Rules); and (iii) **third, any dispute not resolved by mediation within thirty (30) business days of submission of the dispute to mediation, or if either party shall refuse to submit the dispute to mediation, the dispute shall be subject to binding arbitration in Mississauga, Ontario by a single arbitrator under the Rules, subject to this Agreement. Either party may commence arbitration upon first complying with subsections (i) and (ii) above.**

[*See, e.g.*, Filing No. 16-2 at 7-8 (emphasis added) (the "Arbitration Provision").] Blue Giant's quotes were standard price quotations and did not provide manufacturing dates, payment terms, shipping costs and information, freight terms, or taxes. [Filing No. 16-3 at 1.]

After receiving a quote, ODC then sent Blue Giant a Purchase Order specifying the goods that it wanted to purchase based on the quote, and included the quantity and price per item and pricing for shipping and taxes. [Filing No. 16-3 at 2; *see, e.g.*, Filing No. 11-1 at 6.] Blue Giant then sent back an Order Acknowledgment, which provided, among other things, the item number, an item description, the quantity, the price, an extended price, shipping details, payment terms, and a reference to the Terms and Conditions which again stated that they could be found on Blue

3

Giant's website. [Filing No. 16-3 at 2; *see, e.g.*, Filing No. 11-1 at 2-3.] ODC then confirmed and accepted Blue Giant's Order Acknowledgment via email authorization. [Filing No. 16-3 at 2; *see, e.g.*, Filing No. 25-2 at 1.] Blue Giant's order followed and also contained a reference to Blue Giant's Terms and Conditions and their location on its website. [Filing No. 16-3 at 2; *see, e.g.*, Filing No. 16-6 at 1-2.] Blue Giant then allowed the purchased products to be prepared and shipped and provided an invoice to ODC, which ODC paid. [Filing No. 16-3 at 2.]

  **C.** **ODC's First Purchase of Dock Levelers From Blue Giant**

In April 2021, Indianapolis Fruit Company ("IFC") engaged ODC to install five mechanical dock levelers – purchased by IFC from ODC – at IFC's distribution center located in Indianapolis, Indiana. [Filing No. 11 at 4.] A dock leveler bridges the gap between a trailer and the dock during the loading and unloading process. [Filing No. 11 at 4.] In order to perform its obligations to IFC, ODC purchased the five levelers from Blue Giant for $18,544.56 (the "First Set of Dock Levelers"). [Filing No. 11 at 4.] The parties followed their usual contract formation process. [Filing No. 16-3 at 1; *see supra* Part II.B.]

The First Set of Dock Levelers came with 16-inch lips and were shipped to ODC's facility in Indianapolis in July 2021. [Filing No. 11 at 4.] ODC installed the First Set of Dock Levelers in compliance with Blue Giant's instructions and specifications in August 2021 at IFC's distribution center. [Filing No. 11 at 4.]

  **D.** **Issues With the First Set of Dock Levelers**

Within one month of ODC's initial installation of the First Set of Dock Levelers, ODC ordered five 20-inch replacement lips from Blue Giant at a cost of $4,611.25 because the 16-inch lips were not suitable for IFC's use, including the loading and unloading of trailers carrying bananas. [Filing No. 11 at 5.] Neither the invoice nor the Purchase Order for the 20-inch lips

4

referenced the Terms and Conditions on Blue Giant's website, but the Order Acknowledgement for the 20-inch lips stated "Terms and Conditions can be found at www.bluegiant.com/about-us/terms." [Filing No. 11-2 at 7.]

ODC installed one of the 20-inch lips in early December 2021, but IFC requested that ODC hold off on installing the remaining 20-inch lips. [Filing No. 11 at 5.] Immediately after installing the first 20-inch lip, IFC informed ODC that the dock leveler on which the 20-inch lip had been installed was not picking up the extra weight created by the 20-inch lip, so ODC asked Blue Giant whether any modifications were necessary and Blue Giant advised that none were. [Filing No. 11 at 5.]

### E.  ODC's Purchase of Additional Dock Levelers From Blue Giant

In April 2022, ODC and IFC entered into a contract for the purchase and installation of an additional 34 dock levelers at IFC's distribution center (the "Second Set of Dock Levelers"). [Filing No. 11 at 5.] The parties again followed their usual contract formation process. [Filing No. 16-3 at 1; *see supra* Part II.B.]

The dock levelers in the Second Set of Dock Levelers all came equipped with a 20-inch lip. [Filing No. 11 at 5.] ODC installed the Second Set of Dock Levelers in compliance with Blue Giant's instructions and specifications between June 2022 and August 2022. [Filing No. 11 at 6.]

### F.  Continued Issues With the Blue Giant Dock Levelers

On August 15, 2022, ODC contacted Blue Giant regarding ratchet bar and lip engagement failures on the Blue Giant Dock Levelers. [Filing No. 11 at 6.] Additionally, on September 13, 2022, ODC notified Blue Giant that an IFC employee had been injured five days earlier while attempting to walk down one of the Second Set of Dock Levelers using a forklift. [Filing No. 11 at 6.]

####     G.      ODC's Efforts to Repair the Blue Giant Dock Levelers

Between August 15, 2022 and September 1, 2023, ODC made 51 repair trips to IFC's distribution center to adjust or repair the Blue Giant Dock Levelers at a total cost to ODC of over $55,000. [Filing No. 11 at 7.] At the direction of Blue Giant, ODC installed modified shock weldments and catch springs supplied by Blue Giant to the Blue Giant Dock Levelers in an attempt to take tension off the main springs and allow the lips of the Blue Giant Dock Levelers to engage as designed. [Filing No. 11 at 7.] This repair was not successful and ODC purchased eight conversion kits to convert some of the Blue Giant Dock Levelers from mechanical dock levelers to hydraulic dock levelers at a cost of approximately $4,000. [Filing No. 11 at 7.] In compliance with Blue Giant's instructions and specifications, ODC installed six of the eight conversion kits at IFC's distribution center but the issues remained. [Filing No. 11 at 7-8.] Despite ODC's efforts, none of the Blue Giant Dock Levelers ever functioned as represented, advertised, and warranted by Blue Giant. [Filing No. 11 at 8.]

####     H.      The Lawsuit

ODC and Blue Giant attempted to mediate their disputes, but mediation was unsuccessful. [Filing No. 16-3 at 1.] ODC then initiated this litigation on December 12, 2023, [Filing No. 1], and filed the operative Amended Complaint on January 9, 2024, [Filing No. 11]. It sets forth claims for: (1) breach of contract; (2) breach of express warranty (base warranty); (3) breach of express warranty (product-specific warranty); (4) breach of express warranty pursuant to Ind. Code § 26-1-2-313; (5) breach of implied warranty of merchantability pursuant to Ind. Code § 26-1-2-314; (6) breach of implied warranty of fitness for a particular purpose pursuant to Ind. Code § 26-1-2-315; and (7) fraudulent misrepresentation. [Filing No. 11 at 10-18.] Blue Giant has filed a

Motion to Dismiss all of ODC's claims for improper venue under Fed. R. Civ. P. 12(b)(3). [Filing No. 16.]

### III.
### DISCUSSION

In support of its motion, Blue Giant argues that the parties' contracts included the Arbitration Provision, which requires that the parties' disputes be arbitrated in Ontario, Canada. The Court first addresses whether the Arbitration Provision is part of the parties' contracts and then, if so, whether it requires arbitration of ODC's claims in Ontario, Canada.

A.   **Whether the Parties' Contracts Included the Arbitration Provision**

In support of its Motion to Dismiss, Blue Giant argues that the issue of contract formation is governed by the United Nations Convention on Contracts for the International Sale of Goods (the "CISG") because Blue Giant's and ODC's "places of business" are in different countries – ODC in the United States and Blue Giant in Canada – and both countries have adopted the CISG. [Filing No. 17 at 3.]  Blue Giant acknowledges that its price quotes "were not sufficiently detailed to constitute offers [under the CISG] because they left open terms that were necessary for the formation of a contract; including, for example, manufacturing dates, payment terms, shipping costs and information, [and] freight terms or taxes," but that ODC's Purchase Orders were offers because they had definite terms. [Filing No. 17 at 8-9.] Blue Giant contends that it responded to ODC's Purchase Orders with Order Acknowledgements that did not agree with the Purchase Orders and contained different terms, so were counteroffers. [Filing No. 17 at 9.]  It asserts that the Order Acknowledgements required order confirmation within 24 hours and required ODC to send acceptance to Blue Giant's email address, so "[were] not and could not be an acceptance of ODC's Purchase Order[s]." [Filing No. 17 at 9.]  Additionally, it argues that the Order Acknowledgements expressly referenced the Terms and Conditions, so "by proposing Terms and

7

Conditions to ODC in response to the Purchase Order[s], the Order Acknowledgment[s] acted as…counteroffer[s], and not…acceptance[s] of the Purchase Order[s]." [Filing No. 17 at 9.] Blue Giant argues further that the Order Acknowledgments contained different payment terms, different shipping methods/terms, and estimated shipping dates. [Filing No. 17 at 9.] It contends that ODC accepted the counteroffers in the Order Acknowledgments by email confirmations, by allowing the products to be manufactured and shipped, and by paying Blue Giant's invoices. [Filing No. 17 at 9-10.] Blue Giant notes that the Order Acknowledgments also contained reference to the Terms and Conditions. [Filing No. 17 at 10.] It argues that ODC "knew or could not have been unaware" that Blue Giant intended the Terms and Conditions to be a part of the counteroffer, and that the fact that the Terms and Conditions were provided by reference to an internet URL rather than attached to the Order Acknowledgement is irrelevant. [Filing No. 17 at 11-15.]

In its response, ODC also focuses on the language of the Order Acknowledgments and argues that the mere reference to the Terms and Conditions on Blue Giant's website does not incorporate those Terms and Conditions into the parties' contract. [Filing No. 21 at 5-6.] It asserts that Blue Giant has not provided any evidence that ODC had actual knowledge of the Terms and Conditions, noting that Blue Giant sent various documents to ODC – including "an installation and technical manual and an owner's manual" – but never provided ODC with a copy of the Terms and Conditions. [Filing No. 21 at 8.] ODC contends that the Terms and Conditions attached to the Motion to Dismiss were printed on February 16, 2024, and there is no evidence that the Terms and Conditions in effect in 2021 and 2022 when ODC made its purchases were the same. [Filing No. 21 at 8.] It argues that Blue Giant was required to clearly communicate its intent to include the Terms and Conditions in the parties' agreements, that it did not do so, and that it "merely pointed [ODC] to where [the] Terms and Conditions could be located." [Filing No. 21 at 10-12.]

ODC asserts that Blue Giant could have expressed its intent to include the Terms and Conditions in the parties' agreements by using phrases such as "subject to," "in accordance with," "shall control," or "which is hereby incorporated by reference as if fully rewritten herein," but did not do so. [Filing No. 21 at 14.]

In its reply, Blue Giant argues that its "repeated, conspicuous references throughout the contract formation process" show that it intended to include the Terms and Conditions as part of the parties' contracts. [Filing No. 25 at 1-2.] It asserts that ODC does not challenge the contract formation process Blue Giant has set forth, including "the method, manner or process of contract formation." [Filing No. 25 at 2.] Blue Giant contends that ODC does not argue that the Terms and Conditions were not made known to it or that their location on Blue Giant's website was not conspicuous, but rather only argues that Blue Giant never communicated that it intended the Terms and Conditions to control. [Filing No. 25 at 3.] It asserts that ODC "offers no evidence that it was unaware of [the] 'Terms and Conditions' or that they were hidden or that it did not know that they existed." [Filing No. 25 at 4.] Blue Giant asserts that ODC does not argue that it ever tried to access Blue Giant's website at any time during 2021 or 2022 and that, in any event, the same Terms and Conditions as appear on Blue Giant's website now were in effect during that time. [Filing No. 25 at 5.] It argues that the Order Acknowledgments "plainly identified on the first page in a defined box in the upper portion of that page that [Blue Giant's] Terms and Conditions could be found at www.bluegiant.com/about-us/terms" and that the reference to the Terms and Conditions being found on the website was also contained in Blue Giant's quotes and correspondence with ODC. [Filing No. 25 at 5-6 (emphasis in original).] Blue Giant argues further that under the CISG the Terms and Conditions were a part of the parties' contracts because "a reasonable person in ODC's position would have understood" that was the case. [Filing No. 25 at 7.] Blue Giant points to

9

language from a CISG Advisory Council Opinion related to the reference to terms and conditions on websites and asserts that "magic incorporation language is not necessary for incorporation of conspicuous terms and conditions." [Filing No. 25 at 8.] It relies on numerous cases from outside of the Seventh Circuit to support its position. [Filing No. 25 at 9-10.]

    1.  *Applicable Law*

 At the outset, the Court discusses the law that applies to the formation of the parties' contracts. The parties both contend that the CISG applies to the formation of the contracts in this case, [*see* Filing No. 17 at 3; Filing No. 21 at 5], and the Court agrees. Specifically, the CISG "applies to contracts of sale of goods between parties whose places of business are in different [countries]…when the [countries] are [treaty countries]." [CISG, Pt. I, Ch. I, Art. 1(1).][1] ODC's principal place of business is in the United States, [Filing No. 11 at 1], Blue Giant's principal place of business is in Canada, [Filing No. 11 at 1-2], and both the United States and Canada are treaty countries,[2] so the CISG applies to contract formation issues. *See VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 748 F.3d 780, 787 (7th Cir. 2014) (CISG applies to contracts for the sale of goods between parties with places of business in different treaty countries).

 The CISG is federal law, and supersedes the state law that would normally apply to contract formation issues. *Id.*; *see also* 28 U.S.C. § 1652 ("The laws of the several states, except where the Constitution or treaties of the United States…otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."). The CISG explicitly applies to contract formation issues like the one present in this case. *See*

---

[1] The Court cites to the CISG, which can be found at www.uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/19-09951_e_ebook.pdf (last visited June 20, 2024).

[2] *See* www.cisg-online.org/cisg-contracting-states/contracting-states-by-name (last visited June 20, 2024).

CISG, Pt. I, Ch. I, Art. 4 ("This Convention governs only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract….[I]t is not concerned with: *(a)* the validity of the contract or of any of its provisions or of any usage; *(b)* the effect which the contract may have on the property in the goods sold."). The Court will apply the CISG to the issue of whether the parties' contracts included the Arbitration Provisions set forth in the Terms and Conditions.

        2.     *Timing of Contract Formation*

As to the timing of formation of a contract, the CISG provides that "[a] reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer," and that "[a]dditional or different terms relating, among other things, to the price, payment, quality and quantity of the goods, place and time of delivery, extent of one party's liability to the other or the settlement of disputes are considered to alter the terms of the offer materially." CISG, Pt. II, Ch. II, Art. 19. The parties agree that Blue Giant's Order Acknowledgments were counteroffers to ODC's Purchase Orders, and that ODC accepted those counteroffers when it confirmed and accepted the Order Acknowledgments. [*See* Filing No. 17 at 8-9 (Blue Giant contending that ODC's Purchase Orders were offers, Blue Giant's Order Acknowledgments were counteroffers, and ODC's email confirmations of the Order Acknowledgments were acceptances of Blue Giant's counteroffers); Filing No. 21 at 2-3 (ODC noting that Blue Giant contends that the Order Acknowledgments were "the ultimate contract(s) between the parties," and not disputing that contention) (emphasis omitted).]

The Court concurs with the parties' agreement that Blue Giant's Order Acknowledgments were counteroffers to ODC's Purchase Orders, and that ODC's email confirmations of the Order

11

Acknowledgments were acceptances of Blue Giant's counteroffers. Blue Giant's Order Acknowledgments provided a shipping method and payment terms – neither of which were included in ODC's Purchase Orders and which materially altered the terms of the parties' agreements – and ODC then accepted the Order Acknowledgments by acknowledging them via email. [*See, e.g.*, Filing No. 11-1 at 6 (ODC's Purchase Order for Order No. 479147.3, which does not contain reference to a shipping method or payment terms); Filing No. 11-1 at 2 (Order Acknowledgment for Order No. 479147.3, which provides "SHIPPING METHOD – Cheapest" and PAYMENT TERMS – NET 45"); Filing No. 16-6 at 3 (May 4, 2021 email from Phil Lehr at ODC to Blue Giant acknowledging Order No. 479147.3).]

The Order Acknowledgments constitute the parties' contracts – which included the new shipping method and payment terms provisions. *See Roser Techs., Inc. v. Carl Schreiber GmbH*, 2013 WL 4852314, at *11 (W.D. Pa. Sept. 10, 2013) (applying CISG and finding that email response to counteroffer constituted acceptance of counteroffer and formation of contract). The Court goes on to consider whether the Terms and Conditions were part of those contracts.

### 3. Inclusion of the Terms and Conditions in the Parties' Contracts

Despite agreeing that the Order Acknowledgments constitute their contracts, the parties do not agree regarding whether the reference to the Terms and Conditions in the Order Acknowledgements was sufficient to make the Terms and Conditions part of the parties' contracts. The Court did not locate any cases within the Seventh Circuit considering whether reference to a website containing terms and conditions is sufficient to incorporate those terms and conditions into the parties' contract under the CISG. The Court begins its analysis with a CISG Advisory Opinion, and then considers cases from outside of the Seventh Circuit analyzing the issue under similar facts.

In CISG Advisory Opinion No. 13, the CISG Advisory Council stated:

1.     The inclusion of standard terms under the CISG is determined according to the rules for the formation and interpretation of contracts under the CISG.

2.     Standard terms are included in the contract where the parties have expressly or impliedly agreed to their inclusion at the time of the formation of the contract and the other party had a reasonable opportunity to take notice of the terms.

3.     Amongst others, a party is deemed to have had a reasonable opportunity to take notice of standard terms:

> 3.1.    Where the terms are attached to a document used in connection with the formation of the contract or printed on the reverse side of that document;
>
> 3.2.    Where the terms are available to the parties in the presence of each other at the time of negotiating the contract;
>
> 3.3.    Where, in electronic communications, the terms are made available to and retrievable electronically by that party and are accessible to that party at the time of negotiating the contract;
>
> 3.4.    Where the parties have had prior agreements subject to the same standard terms.

4.     Standard terms cannot be incorporated after the formation of the contract, unless the contract is modified by agreement.

5.     A reference to the inclusion of standard terms and the standard terms themselves must be clear to a reasonable person of the same kind as the other party and in the same circumstances.

6.     A reference to the inclusion and the standard terms will be regarded to be clear where:

> 6.1.    They are readable and understandable by a reasonable person; and
>
> 6.2.    They are available in a language that the other party could reasonably be expected to understand….

7.     Standard terms that are so surprising or unusual that a reasonable person of the same kind as the relevant party could not reasonably have expected such a term in the agreement, do not form part of the agreement.

www.cisg-online.org/files/ac_op/CISG_Advisory_Council_Opinion_No_13.pdf (last visited June 20, 2024).

> In Comment B.(d)3.4, the Advisory Council states:
>
> 3.4. It is today commonplace for commercial parties to have websites containing information about that party and very often containing the standard terms on which that party contracts. Where a party during negotiations refers to the inclusion of standard terms or where there is an incorporation clause in the offer referring to the website, the other party has a reasonable opportunity to take notice of those terms if they are generally accessible over the internet at the time of contracting. This is particularly true if the contract is being concluded via the website. Where the contract has been concluded by other means such as email or in person, a reference to the document on a website will also suffice if access to the website was reasonably available to the other party at that time.

*Id.*

Here, ODC concedes that the Order Acknowledgements – which included a reference to the Terms and Conditions on Blue Giant's website – were counteroffers which ODC accepted. But that does not end the Court's inquiry. The Order Acknowledgments must have referred to "the inclusion of standard terms" or have contained an incorporation clause referring to the website such that inclusion was clear to a reasonable person in order for the Terms and Conditions to be part of the parties' agreement. *Id.* They did not.

The Order Acknowledgments merely state that "Terms and Conditions can be found at www.bluegiant.com/about-us/terms." [*See, e.g.*, Filing No. 11-1 at 2.] They do not state that those Terms and Conditions are included in or incorporated into the counteroffer, that the counteroffer is subject to the Terms and Conditions, or other similar language evincing a clear intent on Blue Giant's part to make the Terms and Conditions part of its counteroffer. In the absence of such

14

language, the Order Acknowledgments did not make it clear to a reasonable person that the Terms and Conditions were included.[3]

Courts considering similar factual situations under the CISG have found that without clear language indicating that information found on the seller's website is included in or incorporated into the accepted offer or counteroffer, the website information is not part of the parties' agreement. *See Roser Techs., Inc.*, 2013 WL 4852314, at *9 (holding that conditions of sale on seller's website were not part of parties' agreement where order confirmations stated that they were "subject to our standard conditions of sale as known (www.csnmetals.de)," because "[t]he language included on the order confirmations was ambiguous at best, as the language merely directs the other party to a website which needs to be navigated in order for the standard conditions to be located," "[t]here is no evidence that [the buyer] had actual knowledge of the attempted inclusion of [the seller's] standard conditions," "[t]here is no evidence that the parties had discussed incorporation of the standard conditions during contract negotiations," "[t]here is no evidence that [the buyer] actually received [the seller's] standard conditions," and "no employee of [the buyer] initialed next to the statement attempting to incorporate the standard conditions"); *CSS Antenna, Inc. v. Amphenol-Tuchel Elec., GmbH*, 764 F. Supp. 2d 745, 754 (D. Md. 2011) (language stating "[o]ur general conditions of delivery can be viewed or downloaded as .pdf file from our homepage: http://www.amphenol.de" was "ambiguous at best" and did not indicate a clear intent to include

---

[3] Although correspondence between ODC and Blue Giant after ODC had confirmed the Order Acknowledgments included references to the Terms and Conditions, that correspondence is not relevant because the parties had already formed contracts and, in any event, that correspondence also only generally and vaguely referred to the Terms and Conditions without explicitly stating that they were included in or incorporated into the parties' agreement. [*See, e.g.*, Filing No. 25-3 at 3 (email to ODC attaching Order Acknowledgments and stating "Terms and Conditions of sale, including a material escalation clause, can be found at www.bluegiant.com/about-us/terms") (emphasis in original).]

15

the general conditions in the parties' agreement, so forum selection clause contained in general conditions was not part of parties' agreement).

Moreover, the Order Acknowledgements' reference to the Terms and Conditions is even more ambiguous when read in context. Specifically, the reference is contained in the following paragraph of the Order Acknowledgments, which is in fine print that is smaller than the rest of the font on the document:

> This document confirms receipt of your purchase order. All Equipment orders must be confirmed by the customer within 24 hours. Send acceptance to orderentry@bluegiant.com. Only Orders that have been confirmed will be scheduled for Manufacturing. All Parts orders, unless specified in the purchase order, will be shipped as soon as the part becomes available. Terms and Conditions can be found at www.bluegiant.com/about-us/terms.

[*See, e.g.*, Filing No. 11-1 at 3.] The paragraph in which the reference to the Terms and Conditions appears discusses order confirmation and parts shipments, creating the impression that the Terms and Conditions it then references relate to those two issues – and not to a provision requiring arbitration in Canada. See *CSS Antenna, Inc.*, 764 F. Supp. 2d at 754 (noting that "[t]he ambiguity of the language referencing the General Conditions is further highlighted by the specificity of the surrounding language in the purchase confirmation form" where paragraph containing reference to General Conditions on seller's website (which contained forum selection clause upon which seller was attempting to rely) discussed defect claims and delivery terms).

Blue Giant cites to several cases that it contends supports its position that the Terms and Conditions were part of its contracts with ODC, but those cases all differ from this case in important respects. See *Brass Reminders Co., Inc. v. RT Eng'g Corp.*, 844 F. App'x 813, 822 (6th Cir. 2021) (not decided under the CISG and terms and conditions listed in quote as separate item along with other separate items and also in quote's table of contents and at end of quote); *N.F. Smith & Assoc.,, L.P. v. Karl Kruse GmbH & Co. KG*, 2023 WL 7474046, at *5 (S.D. Tex. Oct.

16

10, 2023) (full text of terms and conditions set forth in purchase order, which court found constituted the parties' contract); *Bling v. Matrix Pkg. Mach., LLC*, 2022 WL 17251983, *7 (E.D. Wisc. Nov. 28, 2022) (not decided under the CISG and contract stated that all orders were "subject to the Terms and Conditions of Sale found on our website"); *Segenvo, LLC v. Providian Med. Equip., LLC*, 2019 WL 5266163, at *7 (S.D. Tex. Oct. 17, 2019) (not decided under the CISG and contract stated "[s]tandard terms and conditions are set forth on the attached Terms of Sale, which is hereby incorporated by reference as if fully rewritten herein"); *Infinity Fluids, Corp. v. General Dynamics Land Sys., Inc.*, 2013 WL 3158094, at *4-5 (D. Mass. June 19, 2013) (not decided under the CISG and purchase order directed buyer to seller's website "for purchase order terms and conditions"); *Golden Valley Grape Juice and Wine, LLC v. Centrisys Corp.*, 2010 WL 347897, at *3 (E.D. Cal. Jan. 22, 2010) (separate General Conditions were attached to an email containing the offer that the buyer ultimately accepted); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. Mar. 29, 2007) (not decided under the CISG and electronic contract required buyer to click on box stating "Yes, I agree to the above terms and conditions").

In sum, the Court finds that while the Order Acknowledgements constituted the parties' agreements, their vague reference to the Terms and Conditions was not sufficient under the CISG to make the Terms and Conditions part of the parties' agreements because the Order Acknowledgments did not explicitly state that the Terms and Conditions were included in or incorporated into the Order Acknowledgments. Consequently, the Arbitration Provision contained

in the Terms and Conditions was not part of the parties' agreements. Blue Giant's 12(b)(3) Motion to Dismiss for Improper Venue, [Filing No. 16], is **DENIED**.[4]

### IV.
### CONCLUSION

For the foregoing reasons, Blue Giant's 12(b)(3) Motion to Dismiss for Improper Venue is **DENIED**. [16.] This matter will proceed in this Court and the Court **REQUESTS** that the Magistrate Judge confer with the parties as soon as practicable to develop a case management plan and to discuss possible resolution of this matter.

Date: 6/20/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

---

[4] Because the Court has found that the Arbitration Provision contained in the Terms and Conditions was not part of the parties' agreements, it need not and does not consider ODC's argument that there is no evidence that the Terms and Conditions Blue Giant has submitted were the same Terms and Conditions in effect in 2021 and 2022, or the parties' arguments related to the scope of the Arbitration Provision.